# Exhibit 58

[Page 1]

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

HEALEY ALTERNATIVE            )
INVESTMENT PARTNERSHIP,       )
                              )
        Plaintiff,            )
                              )
  Vs.                         ) No. 10-01567
                              )   (RMB)(KMW)
ROYAL BANK OF CANADA and      )
RBC DOMINION SECURITIES       )
CORPORATION a/k/a RBC         )
CAPITAL MARKETS               )
CORPORATION,                  )
                              )
        Defendants.           )
------------------------------)

VIDEOTAPED

DEPOSITION OF PETER BERLANT

New York, New York

November 1, 2013



Reported by:
JENNIFER WIELAGE, CCR, CRR, RPR
JOB NO.  113714

### Page 2

November 1, 2013

10:10 a.m.

Deposition of PETER BERLANT, held at the offices of FOX ROTHSCHILD LLP, 100 Park Avenue, New York, New York, pursuant to Notice, before JENNIFER L. WIELAGE, a Certified Court Reporter, Realtime Reporter and Notary Public of the State of New York.

### Page 3

APPEARANCES:

FOX ROTHSCHILD LLP
Attorneys for Plaintiff
100 Park Avenue - Suite 1500
New York, New York 10017
(212) 878-7900
BY: LAUREN J. TALAN, ESQ.

KATTEN MUCHIN ROSENMAN LLP
Attorneys for Defendants
575 Madison Avenue
New York, New York 10022-2585
(212) 940-8800
BY: WILLIAM M. REGAN, ESQ.
BY: BRIAN L. MULDREW, ESQ.

ALSO PRESENT: HENRY MARTE - Videographer

### Page 4

INDEX

WITNESS

Testimony of:

PETER BERLANT                PAGE NO.

EXAMINATION BY MR. REGAN:         7

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| RBC-132 | Expert Report of Peter Berlant | 28 |
| RBC-133 | RBC 118693 through RBC 118715 | 59 |
| RBC-134 | September 23, 2011 Opinion by Judge Bumb | 66 |
| RBC-135 | Basket Report for June 2013 | 159 |
| RBC-136 | RBC 000753 through 000763 | 184 |
| RBC-137 | RBC 119415 through RBC 119431 | 194 |
| RBC-138 | First page of Report, followed by three basket reports | 226 |
| RBC-139 | RBC 117270 through RBC 117283 | 233 |
|  | RBC 117283 | 233 |
| RBC-140 | Four-page Document | 235 |

### Page 5

DEPOSITION SUPPORT INDEX

DIRECTION TO WITNESS NOT TO ANSWER

Page  Line

REQUEST FOR PRODUCTION OF DOCUMENTS

Page  Line

238  23

STIPULATIONS

Page  Line

QUESTION MARKED

Page  Line

[2] (Pages 2 to 5)

| | |
|---|---|
| 1  **Q.** At present, Anchin Block is<br>2 how big, how many people?<br>3  **A.** Approximately 350 people.<br>4  **Q.** And how many partner level<br>5 people?<br>6  **A.** 55.<br>7  **Q.** And aside from the hedge<br>8 fund area, what other practice areas does<br>9 Anchin Block focus on?<br>10  **A.** We have heavy concentrations<br>11 in construction, real estate, high net<br>12 worth, law firms as clients is a big<br>13 practice area for us, manufacturing,<br>14 distribution, import/export, apparel and<br>15 textile, diamond jewelry. We really run<br>16 the gamut. Not a lot of industries we<br>17 don't touch.<br>18  **Q.** Prior to this case, have you<br>19 ever done any work for Healey Alternative<br>20 Investment Partnership?<br>21  **A.** No.<br>22  **Q.** Have you ever done any work<br>23 for any other Healey family entity?<br>24  **A.** No.<br>25  **Q.** Have you ever done any work<br>[Page 22] | 1 witness before?<br>2  **A.** Expert advisor.<br>3  **Q.** What do you mean?<br>4  **A.** There was a matter involving<br>5 a Madoff entity, and I was called in by<br>6 the trustee for one of the funds to look<br>7 over some audit work papers and give some<br>8 advices to area where I believed there<br>9 was potential exposure to the accounting<br>10 firm.<br>11  **Q.** Did you prepare a written<br>12 report of any kind for the trustee in<br>13 that matter?<br>14  **A.** No.<br>15  **Q.** And you never testified in<br>16 that matter at deposition or at trial?<br>17  **A.** No, sir.<br>18  **Q.** Have you ever prepared an<br>19 expert report prior to the one you<br>20 prepared for this case?<br>21  **A.** I have not.<br>22  **Q.** So I think you said you had<br>23 given four or five depositions; is that<br>24 correct?<br>25  **A.** Approximately.<br>[Page 24] |
| 1 for Robert Healey or any Healey family<br>2 member?<br>3  **A.** No.<br>4  **Q.** How about for Viking<br>5 Associates?<br>6  **A.** No.<br>7  **Q.** Have you ever worked with<br>8 the Fox Rothschild firm before?<br>9  **A.** Yes.<br>10  **Q.** In what capacity?<br>11  **A.** We have some mutual clients.<br>12  **Q.** Have you ever served as an<br>13 expert witness in a Fox Rothschild matter<br>14 before?<br>15  **A.** No.<br>16  **Q.** Have you ever provided<br>17 accounting advice to the Fox Rothschild<br>18 firm?<br>19  **A.** No.<br>20  **Q.** Just an overlap of clients?<br>21  **A.** Just an overlap of clients.<br>22  **Q.** I think earlier we talked<br>23 about prior deposition testimony, but<br>24 depositions aside, prior to this case,<br>25 have you ever been retained as an expert<br>[Page 23] | 1  **Q.** Can you tell me what were<br>2 the matters where you testified in?<br>3  **A.** There were two divorce<br>4 matters. There was a -- it really boiled<br>5 down to an accident, collision matter.<br>6 There was a professional malpractice case<br>7 involving some poorly-prepared financial<br>8 statements for a client of mine against<br>9 her former accountant and that may be the<br>10 extent of it.<br>11  **Q.** Did you ever give any trial<br>12 testimony in any of those matters?<br>13  **A.** No. They were all settled.<br>14  **Q.** Have you ever testified at<br>15 an arbitration?<br>16  **A.** No.<br>17  **Q.** Do you know if anyone else<br>18 at Anchin Block has testified as an<br>19 expert in a matter involving hedge fund<br>20 linked derivatives?<br>21  **A.** I'm not aware of anybody.<br>22  **Q.** Have you published any<br>23 books, articles or treatises?<br>24  **A.** No.<br>25  **Q.** Blogs, Internet blogs, web<br>[Page 25] |

**[7] (Pages 22 to 25)**

```
 1  postings, anything like that?
 2      A.  No.
 3      Q.  Your CV lists approximately
 4  21 speeches and presentations at
 5  conferences from 1996 through 2012.
 6          Is that a complete list or
 7  is it a selected presentation?
 8      A.  It's pretty complete.  If
 9  one or two were missed, it was
10  inadvertent.
11      Q.  Did any of the speeches or
12  presentations concern hedge fund-linked
13  derivatives?
14      A.  No, not specifically.
15      Q.  Generally?
16      A.  Generally, we've been
17  involved in the hedge fund business for a
18  while, so at some point update from an
19  expert panel might have included some
20  concept of SWAPs and derivatives, but it
21  would have been a minor point within a
22  broader outline.
23      Q.  Would you have been the
24  prosecutor on SWAPs and derivatives?
25      A.  Probably not.  It would have
```
[Page 26]

```
 1  been a panel.
 2      Q.  You might have been the
 3  chair of the panel or a chair of the
 4  conference?
 5      A.  I was -- at that point I may
 6  have been the moderator on the panel or
 7  one of the participants in the panel and
 8  you pull your topics together and then
 9  you draw straws as to who presents which
10  piece.
11      Q.  With regard to the one that
12  concerned SWAPs or derivatives, do you
13  know if there were any written
14  presentations -- written materials handed
15  out?
16      A.  There would have been.
17      Q.  Do you have a copy of those
18  written materials?
19      A.  Not with me, and I don't
20  know if I could dig them up.
21      Q.  Do you know which conference
22  that was?
23      A.  Well, I'm going to guess it
24  was probably within the last three or
25  four years that New York State Society of
```
[Page 27]

```
 1  CPAs Investment Companies Conference, my
 2  apologies, and I don't know with
 3  certainty whether that would have been
 4  covered or not.  I'd have to go back to
 5  the outlines if I could even get them.
 6      Q.  Okay.
 7          MR. REGAN:  Please mark as
 8  RBC Exhibit 132 a 48-page document
 9  titled Expert Report of Peter L.
10  Berlant.
11          (Exhibit RBC-132, Expert
12  Report of Peter Berlant, was
13  marked for Identification by the
14  court reporter.)
15  BY MR. REGAN:
16      Q.  Mr. Berlant, please take a
17  moment to review the document that we've
18  marked as Exhibit 132 and if you can, can
19  you confirm for me what it is?
20      A.  It's the report I submitted.
21      Q.  If I can direct your
22  attention to page 43, there's an
23  inscription on that page of your prior
24  experience, correct?
25      A.  That's correct.
```
[Page 28]

```
 1      Q.  In the second paragraph,
 2  one, two, three, four, five lines down,
 3  there's a sentence that starts:  As a
 4  frequent lecturer, Peter has spoken
 5  before various organizations and
 6  professional groups on topics that have
 7  included -- and then there's a long list.
 8          Included in that list is the
 9  topic Reporting For Derivative Financial
10  Instruments.
11          Is that a speech that you
12  have given?
13      A.  That is.
14      Q.  Can you tell me more about
15  it?  When was it given?
16      A.  That one was probably a very
17  long time ago.  I would have to go back
18  through, and at that point we were
19  dealing with, you know, basic SWAPs,
20  basic derivatives, nothing --
21      Q.  Interest rate SWAPs, that
22  kind of thing?
23      A.  Very similar, currency
24  SWAPs.
25          My recollection is it
```
[Page 29]

**[8]  (Pages 26 to 29)**

```
 1   Ralph DeSena to Joseph M. Pastore, III,
 2   dated March 18, 2010 that an elective
 3   termination had occurred and, therefore,
 4   the provisions under Section 6, the final
 5   option value and Section 7 option
 6   settlement of the agreement should apply.
 7        My apologies.  I didn't
 8   realize that was one full sentence.  My
 9   question focuses way back in the
10   beginning of the sentence where you
11   referred to:  My experience and
12   familiarity with the operation of the
13   similar agreements.
14        What are the similar
15   agreements that you reference in
16   Paragraph 13?
17        A.   Those would be basket SWAPs,
18   several of my mutual fund clients engage
19   in basket SWAPs.
20        Q.   What is a basket SWAP?
21        A.   It's where you're -- the
22   investment or the return on the one side
23   is based upon a pool of investments, not
24   a single security.
25        Q.   And are any of those basket
                                    [Page 94]
```

```
 1   SWAPs sold by RBC?
 2        A.   No.
 3        Q.   Are the pools of investments
 4   that are in these basket SWAPs hedge
 5   funds?
 6        A.   No.
 7        Q.   What are the securities that
 8   are in the basket SWAPs?
 9        A.   I have seen SWAPs on fixed
10   income secured, bonds, corporate bonds,
11   as well as equities.
12        Q.   Anything else?
13        A.   No, that covers it.
14        Q.   Approximately how many of
15   these basket SWAPs have you had a reason
16   to audit over the course of your career?
17        MS. TALAN:  Objection.
18   BY MR. REGAN:
19        Q.   Let me back up a step.  Have
20   you had occasion to audit any of these
21   basket SWAPs over the course of your
22   career?
23        A.   The answer is yes.  I'm
24   doing a mental count of probably 20 to
25   25.
                                    [Page 95]
```

```
 1        Q.   And which entities are the
 2   sellers of these basket SWAPs?
 3        A.   For the most part, State
 4   Street Bank and I can't tell you which
 5   legal entity within State Street Bank but
 6   one of the State Street entities.
 7        Q.   And which mutual funds are
 8   their purchasers?
 9        MS. TALAN:  Objection.
10        MR. REGAN:  We can designate
11   this all confidential.
12        A.   Yeah, I have a problem with
13   identifying clients, so if we can avoid
14   it, I would prefer.  I mean this day and
15   age, any identifiable information,
16   confidential -- I don't know if I can or
17   I can't answer that question.
18        Q.   I think we can live without
19   the answer for the moment and if that
20   changes, we can come back to there.
21        What types of agreements --
22   what agreements govern these basket
23   SWAPs?
24        A.   It would be the similar --
25   there would be an overlying agreement
                                    [Page 96]
```

```
 1   and, typically, the Master Agreement
 2   would be employed.
 3        Q.   Are you a member of ISDA?
 4        A.   No.
 5        Q.   Have you personally ever
 6   been a buyer of a hedge fund linked
 7   derivative?
 8        A.   No.
 9        Q.   A seller?
10        A.   No.
11        Q.   Have you ever audited a
12   buyer of hedge fund linked derivatives?
13        A.   No.
14        Q.   Seller?
15        A.   No.
16        Q.   Have you ever audited an
17   entity that owned an RBC call option?
18        A.   Not that I'm aware of.
19        Q.   A Zurich call option?
20        A.   Not that I'm aware of.
21        Q.   A SOC-GEN option?
22        A.   Not that I'm aware of.
23        Q.   In any of the basket SWAPs
24   that you dealt with, did any of -- does
25   any of your audit experience involve a
                                    [Page 97]
```

```
 1   valuation price?
 2       A.  Based -- same result.
 3       Q.  How so?
 4       A.  In each -- in either case,
 5   it's a full withdrawal from -- it's a
 6   presumed full withdrawal from each and
 7   every one of those funds.
 8           So I don't see a difference
 9   in that final valuation.  It doesn't
10   generate a valuation difference.
11       Q.  I think I'm not being clear
12   with my questions.
13           Prior to the September 19,
14   2008 e-mail, RBC was required to value
15   the funds listed on that document
16   pursuant to the definition of Option
17   Value in Section 5, correct?
18       A.  Agreed.
19       Q.  Healey sends that September
20   19 e-mail, and now Healey is required to
21   value those funds using the definition
22   required in Section 6?
23       A.  You said --
24       Q.  Final Valuation Price?
25       A.  You said --
                                      [Page 106]
```

```
 1       Q.  RBC --
 2       A.  You said --
 3       Q.  Let me strike the question.
 5           Healey sends the September
 6   19th e-mail and then RBC is required to
 7   value those funds using the process
 8   outlined in Section 6, Final Valuation
 9   Price?
10           MS. TALAN:  Objection.
11       A.  No, that's not what I said.
12   I'm saying that whether they used the
13   Section 5 valuation process, which is
14   what they have historically been doing on
15   partial withdrawals, full withdrawals,
16   basket changes, whatever you want to call
17   them, they have historically been using a
18   consistent methodology wherein they rely
19   on the underlying values by the managers.
20   And I'm saying that what happened
21   September 19th, nothing -- whether you
22   call it a termination or not, nothing
23   changed.  Nothing changed.  The valuation
24   of the underlying -- the underlying --
25   presumed underlying investments is still
                                      [Page 107]
```

```
 1   based upon what it's always been based
 2   upon or could be based upon, what it's
 3   always been based upon.
 4           Had they -- had Healey made
 5   a request at that time for two basket
 6   changes, would RBC not have continued to
 7   do what they were doing?  Had they made a
 8   request for five, for seven, for nine, at
 9   what point did the -- did it tip and it
10   changes and what changed?  That's the
11   part that makes no -- there seems, in my
12   mind, to be no difference in valuation
13   between the two methodologies.
14       Q.  You said RBC changed -- or
15   historically, RBC had been relying on the
16   values provided by the underlying funds.
17   But in each of the 31 removal instances
18   that you looked at, RBC submitted a
19   redemption notice.  It didn't just take
20   the monthly NAV number?
21       A.  It submitted a redemption
22   request, redemption notice, their
23   business, not Healey's business.  They
24   submitted a redemption notice.  They
25   received a report that said here's what
                                      [Page 108]
```

```
 1   you're going to get.  We found
 2   differences between what RBC got and what
 3   Healey got.
 4           So if you want to say that
 5   RBC was somehow adjusting the values to
 6   some other number based upon Paragraph
 7   5's provisions which allowed them to
 8   change the value, they weren't changing
 9   them on an ongoing basis; they were only
10   changing them then when it came --
11   when -- with respect to full withdrawals
12   or full basket changes.  Now --
13       Q.  How do you know that?
14       A.  Well, you tell me.  I mean,
15   I'm looking at 31 -- 31 changes.  Of the
16   31 changes, I believe it was 21 of them,
17   there were discrepancies between what RBC
18   had been doing historically --
19   individually not big differences.
20   Perhaps even clerical errors, I don't
21   know.  I can't speculate as to why it
22   happened; only that it did happen.  Okay?
23           So was RBC making adjustment
24   to those valuations upon withdrawal or
25   were they simply making clerical errors,
                                      [Page 109]
```

**[28] (Pages 106 to 109)**