**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, NY 10022
T: (212) 940-8800
F: (212) 940-8776

*Attorneys for Defendants Royal Bank of Canada*
*and RBC Dominion Securities Corporation*
*n/k/a RBC Capital Markets, LLC*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HEALEY ALTERNATIVE INVESTMENT PARTNERSHIP, <br><br> Plaintiff, <br><br> vs. <br><br> ROYAL BANK OF CANADA and RBC DOMINION SECURITIES CORPORATION n/k/a RBC CAPITAL MARKETS, LLC, <br><br> Defendants. | No. 10-01567 (RMB) (KMW) <br><br> Motion Date: July 7, 2014 |

**AFFIDAVIT OF JASON SPACEK**

STATE OF NEW YORK        )
                                          ) ss:
COUNTY OF NEW YORK  )

JASON SPACEK, being duly sworn, deposes and says:

1. I am a Managing Director with RBC, and the senior executive responsible for the Alternative Assets Group ("AAG"), the business unit at RBC responsible for selling, among other things, leveraged investment products linked to the performance of hedge funds.

2. One of the products that AAG sold was a "Cash-Settled Equity Barrier Call Option." This type of call option is a hedge fund-linked derivative product that tracks the performance of an underlying "basket" of hedge funds chosen by the counterparty. More than

200 different counterparties have purchased this type of call option from RBC since the AAG business unit was created in 1997.

3. One of the counterparties to which RBC sold one of the Cash-Settled Equity Barrier Call Option investment products was the named plaintiff in this action, Healey Alternative Investment Partnership ("Healey").

4. Erin Shippee, an RBC employee under my supervision within AAG, served as the primary RBC contact person for Healey.

5. In 2002, I spoke with Ernest Nepa, who worked for Robert T. Healey, a wealthy business person who was looking to invest the money he made from his numerous business enterprises. Mr. Nepa informed me that he wanted to invest in a hedge fund-linked product. After investigating different products offered by different banks, Messrs. Nepa and Healey chose to enter into a transaction with RBC (the "Call Option").

6. Before entering into the Call Option, RBC undertook a due diligence program and provided Healey with comprehensive disclosures in order to ensure that Healey and its four limited partners fully understood the Call Option. For example, Healey and all four of its limited partners completed and signed "Confidential Counterparty Questionnaires." Each of these five Healey parties represented that it was being advised by a major international law firm (Stradley Ronon Stevens & Young LLP) as well as sophisticated accounting, tax, and financial advisors. The Healey parties further represented that they had the knowledge and experience to evaluate the Call Option and that the information provided to RBC was truthful.

7. Healey further represented that it was an "accredited investor, an "eligible contract participant," and a "qualified purchaser," as those terms are defined under the federal securities laws.

8.  RBC also provided and Healey signed a detailed disclosure letter, the purpose of which was for RBC to ensure that Healey understood RBC's role in connection with the Call Option. In this letter, RBC advised that it would be acting as a principal for its own account and not as a fiduciary for Healey, that RBC would not be providing Healey with investment advice, and that Healey was solely responsible for selecting the hedge funds placed in the Basket.

9.  In addition, Messrs. Healey and Nepa each signed and initialed every page of the "Risk Disclosure and Acknowledgement Agreement." Regan Decl., Ex. 22 (Risk Disclosure). In doing so, Messrs. Healey and Nepa agreed, among other things, that:

> a. "The [Call Option] involves structured over-the-counter options for which there is no established secondary trading market . . . **the transaction is ILLIQUID and it may be impossible for Buyer to sell, assign or transfer the [Call Option] to any person for value prior to the scheduled expiration date [November 30, 2017].**" *Id.* at ¶ 3 (Emphasis and capitalization in the original).
>
> b. "The **Transaction is HIGHLY LEVERAGED**, which increases the volatility of the Transaction. Furthermore, **most, if not all, of the Funds also utilize leverage**. As a result, a relatively small movement in the market prices of instruments traded by the Funds can result in substantial losses in the Funds' portfolios." *Id.* at ¶ 4 (Emphasis and capitalization in the original).

10. Moreover, in the Call Option Agreement itself, Healey made a number of additional representations to RBC with respect to its financial sophistication and understanding of the parties' respective duties and obligations. For example, Healey agreed that:

> a. "[Healey] has reached its own conclusions about the [Call Option], and any legal, regulatory, tax, accounting or economic consequences arising from the [Call Option] . . . ." Regan Decl., Ex. 23 (Call Option Agreement) at § 11 (pp. 13-14).
>
> b. "[Healey] has not relied upon any communication (written or oral) of [RBC] or [RBC's] agents as investment advice with respect to the composition of the Basket or as a recommendation to enter into the [Call Option] . . . ." *Id.*
>
> c. "Healey is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of this [Call Option] . . . ." *Id.*

3

11. Healey further represented that it "has reviewed the specific terms and provisions of this [Call Option] in respect of prevailing industry practice and has concluded that **such terms and provisions, and the rights, duties and obligations imposed hereunder, are commercially reasonable** as a general matter and specifically in light of such industry practices." *Id.* at § 11 (p. 14) (emphasis added).

12. The disclosures and representations that Healey made were material to the transaction between RBC and Healey. Without these disclosures and representations, RBC would not have entered into the transaction with Healey.

13. Healey and RBC signed the underlying contract (the "Call Option Agreement") on November 29, 2002. Under that agreement, the Call Option has a number of important features:

    a. The Call Option is a derivative securities product linked to the financial performance of hedge funds. Hedge funds are a category of largely unregulated investments which are by definition illiquid. Among other things, hedge funds dictate subscription and redemption dates, employ "lock-up" periods, and, during exceptional periods of market stress, permit fund managers the right to "drop gates," "side-pocket" assets, and even suspend redemptions of shares entirely. These liquidity rights are set forth in hedge fund offering documents, and Healey expressly represented that it received and reviewed the offering documents for every fund in its Basket.

    b. The performance of the Call Option was linked to the performance of the hedge funds in Healey's Basket, so the amount RBC owed to Healey on the Call Option would increase if the hedge funds in Healey's Basket performed well and went up in value. Under the Call Option Agreement, RBC had the right but not the obligation to

4

hedge this exposure. Notwithstanding that this hedging right was optional under the contract, RBC <u>always</u> hedged its exposure under the Call Option agreement on a dollar-for-dollar basis – for every dollar Healey notionally allocated to a hedge fund, RBC directly invested a dollar in that same fund. In fact, RBC hedged its exposure in this manner for all of its counterparties who purchased fund-linked derivatives.

      c.      The Call Option was a highly leveraged investment. At inception, Healey invested $17.5 million of its own cash, and RBC agreed to provide $52.5 million in leverage, so that the total "notional" value of the Call Option was set at $70 million. Healey later increased its investment to $22 million. Healey then took this $70 million notional amount and allocated it to approximately two dozen hedge funds. In short, Healey invested $17.5 million of its own money but created a $70 million investment, and could lose, at most, its cash investment, with RBC bearing the remainder of any loss.

      d.      The Call Option was a long-term investment vehicle that could be modified by Healey without terminating the agreement. At inception the Call Option was intended to last 15 years, with a "Scheduled Expiration Date" of November 30, 2017. Prior to the Scheduled Expiration Date, Healey had the right to make "Changes to the Basket," meaning that it could add funds or remove funds based on Healey's assessment of market conditions and the funds' future financial performance. RBC reserved the right to veto a hedge fund selected by Healey if the fund did not meet basic due diligence requirements. Healey also could move some or all of its investment to "Cash" without actually terminating the Call Option Agreement.

14.      RBC provided Healey with monthly reports – a "Basket Report" estimating the value of individual funds, and a "Valuation Report" estimating the overall value of the Call

Option. The contract clause governing these estimates—the definition of "Valuation Price"—provides that RBC determine:

> With respect to (i) each Hedge Fund and non-cash distributions thereon, **the estimated USD liquidation value** . . . which may be based in whole or in part upon, among other things, verbal or written statements produced by the Hedge Fund, and/or estimates of such valuation by [RBC] in its sole judgment, and which may include adjustments . . . by [RBC] in its sole judgment to be necessary or appropriate to accurately reflect the estimated liquidation value . . .

Regan Decl., Ex. 23 (Call Option Agreement) at § 5 (p. 5) (emphasis added).

15. Hedge funds typically provide their monthly NAV calculation on a preliminary basis via telephone or e-mail at or near month-end; RBC used this preliminary NAV data to update its Basket Reports. Shortly after month-end, hedge funds send the "official" (but still estimated) NAV for that period in a formal written statement. When RBC received these statements, it further updated the Basket Reports with any change to the NAV and added an asterisk indicating that the value was determined based on a formal monthly statement. The asterisk did not indicate that the RBC had calculated Final Valuation Price.

16. RBC created the Basket Reports and the Valuation Reports in substantial part by totaling up the reported net asset value ("NAV") for each fund in Healey's Basket. An NAV, however, is a hedge fund's estimate of value on a specific date and is not a representation as to the amount a redeeming investor actually will receive when a redemption request is eventually paid. For this reason, the Basket Reports and the Valuation Reports confirm that the data provided is only for informational purposes, that RBC did not independently verify the information on the reports, and that the NAVs of the individual funds at redemption likely will be materially different from the information provided by RBC.

17. Healey frequently exercised its right to add and remove funds from the Basket. From the inception of the Call Option Agreement in November 2002 through the Termination

Date in June 2009, Healey made hundreds of additions and hundreds of removals. Unless a pair-off was available, *see infra* at ¶ 19, the parties followed the same redemption process, which mirrored the redemption process for a direct hedge fund investor. In each instance, Healey asked RBC to submit a redemption notice for a fund; RBC created a "Hedge Fund Redemption Ticket," an internal RBC document that started the redemption process; RBC submitted the redemption notice to the fund administrator within the specified notice period for the next available redemption date; RBC confirmed with the fund administrator that it had received and accepted the redemption request; and, if and when the fund paid the redemption request, RBC used that payment to determine the amount credited to Healey's Basket. When the underlying hedge fund paid RBC's redemption requests, the line item on the Healey's Basket Report for that fund was reduced and the "Cash" line was increased.

18. Mechanically, RBC deposits all option premiums paid by its counterparties in a single, commingled corporate account. RBC then uses its own capital to invest in the hedge funds in order to hedge its exposure, to ensure that RBC has access to performance results from the hedge funds so that it can calculate Valuation Price during the life of the agreement, and to ensure that RBC can submit redemption notices when requested by the counterparty and thereby determine Final Valuation Price when the redemption requests are honored.

19. On a few rare occasions, RBC removed funds through a "pair off" or "internal netting." If by chance one option counterparty wanted to remove a fund while another counterparty was at the same time seeking to gain exposure to that same fund, RBC would simply transfer the exposure from one investor to the other. This process was not required by the Call Option Agreement and was done only as a courtesy when circumstances permitted.

20. The Call Option performed well and at the end of 2007 had an estimated value of $37,895,057.05. As the financial crisis accelerated, Healey began to reduce and deleverage its investment, moving more of its investments in the Basket from hedge funds into Cash (without terminating the Call Option).

21. On September 19, 2008 – four days after Lehman Brothers' bankruptcy filing and in the midst of unprecedented market turmoil – Erich Hickey of Viking Associates instructed RBC, via email, to submit redemption notices to the 16 funds then remaining in Healey's Basket on the "next available dates." The e-mail lists the funds in Healey's Basket, the next available redemption date set forth in each fund's governing documents (some of which were as late as September 30, 2009), and the penalties that Healey expected to pay as a result of its redemptions.

22. RBC followed Healey's instructions. For each of the 16 funds, RBC created a "hedge fund redemption ticket" (an internal RBC document that starts the redemption process) and mailed and faxed a letter to the fund or its administrator requesting a redemption on the effective date specified in Healey's e-mail. Each of the 16 funds responded and indicated whether and/or when the fund would be paying the redemption request.

23. Nine of the funds in Healey's Basket paid the redemption requests without issue: (i) Elliott International Ltd.; (ii) Kayne Anderson MLP Fund, L.P.; (iii) Otter Creek International Ltd. (Class A); (iv) Moore Global Fixed Income Fund Ltd. (Class A); (v) CCI Healthcare Partners, L.P.; (vi) Owl Creek Asia Fund, Ltd. (Class V2); (vii) Winton Futures Fund; (viii) Peak Partners; and (ix) Vicis Capital Fund (Int'l) (Class A). Each of these funds timely honored RBC's redemption request. The remaining seven funds delayed, for varying reasons, the fulfillment of RBC's redemption requests: (i) DellaCamera Capital Fund, Ltd. (Class B); (ii) Taliesin Capital Partners L.P.; (iii) Bay Harbour Partners, Ltd. (Class IV); (iv) Owl Creek II,

L.P.; (v) Investcorp Interlachen Multi-Strategy Fund Ltd.; (vi) Outpoint Capital, LP; and (vii) Drawbridge Global Macro Fund Ltd. These funds, like thousands of other funds during the financial crisis, experienced liquidity problems due to large numbers of investors submitting redemption requests in the same time period, and fund managers exercised their rights to limit, delay, and/or altogether suspend redemptions.

24. Some of the funds have since paid RBC's redemption request in full or in part, and RBC has used those payments to determine the credit owed to Healey's Basket. Other funds, however, remain illiquid.

25. In accordance with the Call Option Agreement, the proceeds of the redemptions initiated on September 19, 2008 (and previously) were first used to pay down the $52.5 million in leverage RBC provided. In June 2009, the leverage owed to RBC was repaid in full. In order for Healey to receive payments before the defined Scheduled Expiration Date of November 30, 2017, the parties needed to formally terminate the Call Option Agreement.

26. On June 15, 2009, the parties entered into the "Termination Agreement," which, among other things, set the "Termination Date" as June 30, 2009. On the Termination Date, RBC was required to begin determining Final Valuation Price for Healey's hedge funds and, after all funds are valued, "Final Option Value." Final Valuation Price is defined, in pertinent part, as follows:

> With respect to (i) each Hedge Fund, the USD amount . . . that **actually would be received upon complete and final settlement** of liquidation or redemption by a hypothetical beneficial owner thereof assuming such beneficial owner properly submitted a notice of full liquidation or redemption to such Hedge Fund on the Expiration Date with instructions to liquidate or redeem such Hedge Fund as soon as possible . . . .

Regan Decl., Ex. 23 (Call Option Agreement) at § 6 (p. 7) (emphasis added).

9

27. During the period from Healey's September 19, 2008 request to redeem the remaining funds in the Basket to the June 30, 3009 termination, Healey did not send a single e-mail or writing of any kind claiming that RBC had followed an incorrect redemption process or seeking payment of the amount shown on the September 2008 Basket Report.

28. The Call Option Agreement contemplates multiple monthly payments due when RBC determines Final Valuation Price for any component of the Basket, defined as "Interim Cash Settlement Amounts." *Id*. at § 7 (p. 8). RBC began making payments to Healey, including: (i) $2,000,000 on June 19, 2009; (ii) $2,299,000 on September 1, 2009; (iii) $1,414,000 on October 1, 2009; (iv) $1,025,000 on November 3, 2009; (v) $218,000 on December 1, 2009; and (vi) $281,000 on January 7, 2010. The first payment on June 19, 2009 was made pursuant to an amended to the Call Option that allowed RBC, as a courtesy to Healey, to make the $2 million payment shortly before the effective Termination Date.

29. Healey sent no written objection to any of these payments. At the time of the Termination Agreement, and over the followings six months, Healey did not once advise RBC that RBC had followed an incorrect redemption process or send a writing of any kind seeking payment of the amount shown on the September 2008 Basket Report.

30. The first time Healey ever sent such a demand was in January 2010, nearly 16 months after its September 19, 2008 e-mail requesting liquidation and 6 months after the Call Option was terminated. Indeed, the very first time that Healey ever claimed that it should not have been treated the same way as an actual investor in a hedge fund with regard to the economic benefits, risks, and liquidity restrictions was January 13, 2010, when Healey's counsel sent RBC a letter stating that Healey should be paid the value shown on the August 2008 Basket Report, more than $27 million.

31. To date, RBC has made 37 payments to Healey totaling $12,251,600. As of the June 2009 Termination Date, the estimated value of the Call Option shown on the monthly Basket Report was $11,409,495. To date, RBC's methodology has resulted in payments to Healey totaling $12,251,600, and the funds remaining in the Basket are currently valued at $1,670,256. Assuming this latter amount can be realized, total payments to Healey will be $13,921,856 (over $2.5 million more than the estimated June 2009 value).

32. Currently, there are 11 discrete funds (or fund parts) remaining in Healey's Basket. The estimated value of the remaining funds is $1,670,256. All of the remaining funds have either suspended redemptions, side-pocketed assets, or otherwise become illiquid. RBC cannot determine a Final Valuation Price for the funds remaining in Healey's Basket until the funds resolve their liquidity issues.

_____
Jason Spacek

Sworn to before me this
28th day of May 2014

_____
Notary Public

SAMANTHA L CONDRON
NOTARY PUBLIC-STATE OF NEW YORK
No. 01CO6175809
Qualified in New York County
My Commission Expires October 15, 2015